STEVEN G. KALAR
Federal Public Defender
Northern District of California
DAVID RIZK
Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:   (415) 436-7700
Facsimile:   (415) 436-7706
Email:       David_Rizk@fd.org

Counsel for Defendant LUQUE

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ALEX LUQUE,<br><br>Defendant. | **Case No.:** CR 19–00627 WHO<br><br>**DEFENDANT'S SENTENCING MEMORANDUM AND REQUEST FOR DOWNWARD VARIANCE**<br><br>**Court:**          Telephonic/Video<br>**Hearing Date:**  May 7, 2019<br>**Hearing Time:**  1:30 p.m. |

## I.     INTRODUCTION

Alex Luque will be before the Court on May 7, 2020 to be sentenced for possession with intent to distribute approximately a *gram total* of cocaine base, heroin, fentanyl, and methamphetamine. Mr. Luque has now been incarcerated at Santa Rita Jail for over four months, since approximately December 19, 2019.  His Guidelines are 10-16 months because he has one drug prior and was on probation at the time of his arrest.[1]  Mr. Luque is a young, impoverished immigrant who lost his job at a repair shop, and became addicted to methamphetamine.  Thankfully, he has overcome his

---

[1] They would have been 6-12 months had he chosen to satisfy the safety valve requirements, but as a lowly street seller he had no valuable information to share and understandably was terrified he would be targeted if he spoke to the government (which he did not).

addiction since his arrest.  After his sentence, he will spend more time in ICE custody and then get deported.  Time served now during the coronavirus is harder than ever before, and the time he has already served has adequately deterred Mr. Luque from reoffending.  He understands that he must not attempt to return to the United States, and at this point, he sincerely does not wish to return.  He wishes to return to his family in Honduras as soon as possible.  He respectfully asks that he be sentenced to time served and three years of supervised release.

## II.   SENTENCING GUIDELINES

The discovery in the case shows that Mr. Luque was arrested on October 28, 2019 with 0.08 net grams of fentanyl, 0.30 net grams of heroin, 0.39 net grams of cocaine base, and 4.29 net grams of methamphetamine.  Rizk Decl., Ex. A.  Unlike the other drugs found, which were individually packaged in small amounts for sale, the methamphetamine was not packaged for sale.  Instead, it was held in a small black container.  Rizk Decl., Ex. B.  Mr. Luque, in his sworn declaration to the Court, explains that he is a methamphetamine user and that the vast majority of the methamphetamine was for his own personal use.  Luque Decl., ¶ 2.  He uses up to a gram of methamphetamine per day every day.  *Id.*  He admits, however, that he sometimes shares small amounts of methamphetamine with other users, including other people on the streets.  *Id.*  He would have shared no more than 0.25 to 0.5 grams of methamphetamine, maximum, of the amount found when he was arrested.  *Id*.  It was not for sale.  *Id.*  The methamphetamine was never tested for purity by the government, despite requests from the defense.  Rizk Decl., ¶ 2.

Accordingly, Mr. Luque submits that the Base Offense Level in this case is correctly calculated as level 12.  The 0.30 net grams of heroin equates to 0.30 kilograms of Converted Drug Weight (CDW); the 0.08 net grams of fentanyl equates to 0.20 kilograms of CDW; the 0.34 net grams of cocaine base equates to 1.21 kilograms of CDW; and the 0.50 grams of a mixture of methamphetamine equates to 1.0 kilogram of CDW.  In total, the drugs are the equivalent of 2.71 kilograms of CDW.  For between 2.5 and 5 kilograms of CDW, the Offense Level is 10.  However, the lowest Offense Level for heroin, methamphetamine, and cocaine base, and fentanyl, is Level 12.  Therefore, the Base Offense Level is 12.  Mr. Luque plead guilty and accepted responsibility for his actions, and therefore is entitled to a two-level downward adjustment.

| | |
|---|---|
| Base Offense Level, U.S.S.G. § 2D1.1(c)(14): | 12 |
| Acceptance of responsibility, U.S.S.G. § 3E1.1: | -2 |
| **Total Offense Level** | **10** |

According to his rap sheet, Mr. Luque has one prior conviction for accessory, PC 32, that dates from July 2017, and for which he received six months of jail and two years of probation. He was on probation at the time of his arrest in this case. He therefore receives four criminal history points and thus falls into Criminal History Category III. The Guidelines sentence for a Total Offense Level of 10 and Criminal History Category III is 10-16 months.

### III.    FACTUAL BACKGROUND[2]

Mr. Luque was born on June 25, 1997 in the town of Cedros, Francisco Morazán, Honduras, to Reina Theresa and Pedro Roberto. Mr. Luque was the youngest of five siblings, two sisters and two brothers. He went to school through the sixth grade. Then, he joined his father working as a *campesino*, planting corn and beans for larger landowners. They did not have their own land or house. They were loaned a small little house, which had no electricity or water, and just a few rooms. They had to borrow water from another nearby neighbor. The family was very impoverished. Sometimes all they had to eat was tortilla and coffee. They often had no money to buy food, and went hungry from time to time. One day in approximately 2007, his father witnessed a murder and later gang members came to threaten him and they told him to leave, which he did (temporarily). Mr. Luque's older brother had a bad head injury when he was younger in an accident, and the family did not have the money to get him adequate medical care, and he never fully recovered. Prior to his arrest, Mr. Luque was speaking to his family once a week and sending them approximately $40 per month. He remains close to them and is worried about his parents, who are getting older in age and have an increasing number of health issues.

Mr. Luque first came to the U.S. in 2016. He came, like so many immigrants, because life was so hard in Honduras. He reports, "my dad and I worked all the time and we still didn't have enough for food." Mr. Luque borrowed money to finance the trip – and still owes a debt of about $1000.

---

[2] Mr. Luque waived a Presentence Report and provides this brief social history to assist the Court in sentencing.

DEFENDANT'S SENTENCING MEMORANDUM AND REQUEST FOR DOWNWARD VARIANCE
*LUQUE*, CR 19–00627 WHO

The trip took approximately a month and a half.  He walked for some of it, but for most of it he rode a freight train, notoriously known as "La Bestia" or The Beast, because it maims or injures migrants who fall off.[3]  Beyond the risk of falling, migrants are vulnerable to the gangs and organized-crime groups that control the routes, which extort and victimize the migrants.[4]  Mr. Luque suffered considerably during the trip.  He reports that he had to beg for food and go hungry.  He witnessed migrants get sick and die along the way.  The difficult conditions did not end at the railroad border crossing.  When he made the trip, Mr. Luque was aware that three people from his own town in Honduras had died in the desert attempting to cross the border.  When he crossed, he was quickly arrested in the desert in Arizona, and removed to Honduras, where he stayed for approximately a year before returning to the United States.  Again, the trip was very difficult.  He does not wish to repeat it a third time.

Mr. Luque came to the Bay Area because he had heard from other migrants that there were more opportunities locally, and that the local community showed sympathy to those who were undocumented.  When he arrived, Mr. Luque found an apartment in Oakland with several people he met here.  Mr. Luque obtained legitimate work at an appliance repair business, located in Oakland, and worked there for approximately six months, earning approximately $430 per week.  Roughly a year and a half ago, he lost his job at the repair business and was unemployed for several weeks.  Mr. Luque tried drugs roughly a month and a half after losing his job for the first time in his life.  He was first introduced to cocaine, and then an acquaintance introduced him to methamphetamine.  After about a week, he was using methamphetamine every day because it was so powerful and addictive. He began selling drugs to finance his own habit since he had no other job opportunities.

He now regrets his behavior and is thankful that he is clean and sober.  Immediately after he was arrested he, he felt addictive urges, but he no longer does.  He never wants to use drugs again

---

[3] "Migrants riding La Bestia are likely to be some of the poorest, as the costs of riding the train (bribes, gang tariffs, etc.) still are cheaper than paying a smuggler to organize and facilitate the journey."  *See* Rodrigo Dominguez Villegas, Migration Policy Institute, *Central American Migrants and "La Bestia": The Route, Dangers, and Government Responses*, Sept. 10, 2014, *available at* https://www.migrationpolicy.org/article/central-american-migrants-and-"la-bestia"-route-dangers-and-government-responses (last accessed April 30, 2020).

[4] *Id.*

because, as he explains, "that's what got me here."  Asked what he wants for himself in the future, he said, "The reality is, I don't want to return here.  It is hard on my family and my parents especially.  They are getting older.  My mother became very depressed when I left and it was hard on her.  My father is also getting older and he has a punctured lung.  I worry a lot that I might not see them again."

## IV.     LEGAL STANDARD

The Court is familiar with the directives of *United States v. Booker,* 543 U.S. 220 (2005) and 18 U.S.C. § 3553(a).  The Sentencing Guidelines range is not mandatory and the Court has a duty to exercise judgment and discretion in arriving at an appropriate sentence.  Importantly, the Court may not presume the Guidelines range is reasonable.  *Nelson v. United States*, 555 U.S. 350, 352 (2009) (per curiam).  Instead, the Court must consider the Guidelines range, the nature and circumstances of the offense, the history and characteristics of the defendant, and the need to avoid unwarranted sentence disparities among similarly situated defendants.  18 U.S.C. § 3553(a)(1), (a)(4) and (a)(6).  In crafting a sentence that is "sufficient, but not greater than necessary," to comply with the purposes set forth in 18 U.S.C. § 3553(a), the Court must also consider the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational and vocational training, medical care, or other correctional treatment in the most effective manner.  18 U.S.C. § 3553(a)(2).

## IV.     ARGUMENT

Several matters warrant the Court's consideration in connection with Mr. Luque's request for a time served sentence and the § 3553(a) factors:

*First*, the charged offense and Mr. Luque's current circumstances counsel in favor of a time served sentence of over four months.  This case should never have been prosecuted federally.  The offense was a very small street-level drug sale that did not involve violence, weapons, possession of large quantities of controlled substances, or other aggravating factors.  Mr. Luque is not a serious offender.  This was a crime driven by desperation and addiction, not for profits or some more

culpable motivation.  Mr. Luque is a very young (23 years old), impoverished, former methamphetamine addict who sold small amounts of drugs on the street to support his own habit and because he had no other prospects.  He has minimal education and no vocational opportunities.  In fact, Mr. Luque is a refugee from poverty and gang violence in Honduras who sought economic opportunities in the United States.  Federal prosecutions such as this one inappropriately single out impoverished immigrants in our community where the gravity of the crime simply does not warrant the use of federal resources, let alone a multi-month sentence.  Given the circumstances of the offense, additional custodial time is certainly not necessary to mete out sufficient punishment, consistent with the mandate of § 3553(a).

*Second*, deterrence does not justify a longer sentence.  As an initial matter, the available data does not support the conclusion that longer sentences promote general deterrence.[5]  Given the particular the circumstances of this case, the concept of specific deterrence does not make much sense either.  More fundamentally, Mr. Luque, like many immigrants, faces far worse conditions in Honduras.  The hardships at home drove him to take the extraordinary and unwelcome steps of fleeing his family and his country, and ultimately to commit the instant crime.  Mr. Luque took these steps in order to survive.  The deterrent value of a marginally longer sentence, weighed against the desperation felt by immigrants such as Mr. Luque, is doubtful at best.  The ordeal of his incarceration and near-certain deportation thereafter is more than sufficient to deter him from reoffending or returning to this country.

*Third*, public safety certainly does not mandate a longer sentence.  Mr. Luque is not violent, he is not a leader or organizer, he does not belong to a gang, and he had no personal stake in any selling operation.  Although the government has attempted justify its misguided campaign of low-level drug prosecutions in the Tenderloin by citing statistics concerning substance abuse and deaths in the area in many of these cases, there is no evidence that prosecuting the lowest level offenders will have any appreciable impact on public health and safety given the supply of desperate migrants in Central

---

[5] *See, e.g.,* Kelli D. Tomlinson, *An Examination of Deterrence Theory: Where Do We Stand?* FEDERAL PROBATION 80 (3), 33-38 (Dec. 2016) ("Severity of punishment was once thought to deliver the main deterrent effect; the more severe the consequence for law-breaking, the less likely an individual is to commit a crime. However, this assumption has not been supported in the literature.").

America.

*Fourth*, Mr. Luque's request for a six-month downward variance comes at a time of extraordinary circumstances.  As of now, there are 1,589 coronavirus cases in Alameda County and 63 deaths.[6]  At Santa Rita Jail, according to the Sheriff, there are have been 37 confirmed coronavirus cases among inmates and staff.[7]  Numerous units (with an unknown number of individuals) and dozens of inmates showing symptoms are quarantined due to exposure to the virus.  *Id.*  These numbers likely understate the scope of infections because testing is so limited.  Out of approximately 1,757 inmates, 111 have been tested with nearly a third of those (35) testing positive and some (5) still pending.  *Id.*

Conditions at Santa Rita Jail are, as the Court is no doubt aware, much worse than usual.  Inmates are in tight quarters; most units have dozens of inmates living together, with two inmates to a cell.  Access to personal hygiene items is limited for those who do not have funds to use at the commissary.  While the jail has provided each inmate with a mask and one additional bar of soap, it is hardly enough to protect the population.  Additionally, the jail has now restricted all visits.  All programming has been discontinued.  Inmates are extremely anxious, and many are trying to stay holed up in their cells to avoid contact.  Mr. Luque is very worried about his own health, and that of his family since has had no recent contact with them.  After Mr. Luque serves his sentence, he will almost certainly be transferred to ICE facility at Yuba County Jail for weeks to months.  Several judges on this Court have already started granting temporary restraining orders to release ICE detainees at Yuba County Jail due to poor conditions and health risks to the detainees.[8]

In sum, this is an exceptionally difficult to time to serve a sentence.  Time served now is much harder than time served under normal circumstances and conditions are not likely to change anytime soon.  Thus, the time Mr. Luque has already served should be considered a much harsher sanction

---

[6] *Coronavirus in California: Map and Case Count*, The New York Times (April 30, 2020), *at* https://www.nytimes.com/interactive/2020/us/california-coronavirus-cases.html (updated regularly).
[7] Alameda County Sheriff, COVID-19 Update (April 30, 2020) *at* https://www.alamedacountysheriff.org/admin_covid19.php.
[8] *See, e.g., John Doe v. Barr*, No. 20-CV-02141 LB, ECF No. 27 at 10-11 (N.D. Cal. Apr. 12, 2020) (order describing conditions of confinement at Yuba and granting release); *see also Bahena Ortuno, et al., v. Jennings, et al.,* No. 20-CV-02064 MMC, ECF No. 38 (N.D. Cal. Apr. 8, 2020) (order granting release).

than it would otherwise in normal times.  Even if the Court grants Mr. Luque's request for a time served sentence, he is likely to spend more time in custody.  In view of all this, Mr. Luque respectfully asks the Court to consider a significant downward variance to time served.

*Fifth*, and finally, Mr. Luque personal history strongly counsels in favor of a downward variance.  Although this Court frequently sees defendants who come from impoverished backgrounds, Mr. Luque has overcome particular challenges.  He has little education, spent much of his childhood performing hard labor in the fields, and will return to a difficult existence in Honduras soon.  When he came to the United States, Mr. Luque was only looking for an escape from poverty.  Due to his youth and lack of contacts here, when he lost his job he fell into drugs—an awful ordeal all of its own.  Thus, while the instant offense is reprehensible, it is also understandable why Mr. Luque committed the crime out of desperation.  He is sincere in his desire to be with his family and never return to drugs or the United States.  Thus, Mr. Luque's personal circumstances also favor a time served sentence.

## V.    CONCLUSION

For all the reasons set forth above, Mr. Luque respectfully asks that the Court sentence him to time served followed by three years supervised release.


Dated:      April 30, 2019                           Respectfully submitted,

                                                     STEVEN G. KALAR
                                                     Federal Public Defender
                                                     Northern District of California


                                                             /S
                                                     _____
                                                     DAVID RIZK
                                                     Assistant Federal Public Defender